# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| **ELIORMINIA CASANOVA,** individually, and on behalf of all others similarly situated, | ) ) ) ) ) |
| **Plaintiff,** | ) ) |
| **v.** | ) Case No. 8:25-cv-1242 ) |
| **SUNCOAST CREDIT UNION** | ) ) |
| **Defendant.** | ) ) ) |

## CLASS ACTION COMPLAINT AND DEMAND FOR A JURY TRIAL

Plaintiff, Eliorminia Casanova, individually, and on behalf of all others similarly situated, (hereinafter "Plaintiff") brings this Class Action Complaint against Defendant, Suncoast Credit Union ("Suncoast" or "Defendant"), and alleges, upon personal knowledge as to her own actions, and upon information and belief as to all other matters, as follows.

## INTRODUCTION

1.     Plaintiff brings this class action to address Defendant's outrageous, illegal, and widespread practice of disclosing—without consent—the Nonpublic

Personal Information[1] and Personally Identifiable Financial Information[2] (together, "Personal and Financial Information") of Plaintiff and the proposed Class Members to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook" or "Meta"), Facebook Events, Google, LLC ("Google"), Google Analytics, DoubleClick Ads, Siteimprove, AdTheorent, Nextdoor, AdsWizz, TikTok, Sitecore, AlphaRank, BlueShift, Adroll, MNTN, Microsoft Clarity, The Trade Desk, Centro/SiteScout Basis, Tapad, Extole, and New Relic (collectively the "Third Parties") (in short, "the Disclosure").

2.    Suncoast is a full-service financial institution which provides "banking solutions including checking accounts, savings accounts, mortgages, auto loans, home equity loans, HELOCs and much more" to customers across the United States, including in Florida. To provide these services, Suncoast operates and encourages its customers to use its website, www.suncoast.com (the "Website"), on which

---

[1] The United States Congress defines "nonpublic personal information" as "personally identifiable financial information-- (i) provided by a consumer to a financial institution; (ii) resulting from any transaction with the consumer or any service performed for the consumer; or (iii) otherwise obtained by the financial institution." The Gramm-Leach-Bliley Act, 15 U.S.C.A. § 6809(4)(A) ("GLBA").

[2] "Personally identifiable financial information means any information: (i) A consumer provides to [a financial institution] to obtain a financial product or service from [the financial institution]; (ii) About a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer; or (iii) [a financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer." 16 C.F.R. § 313.3(o)(1).

customers can access their account information, access Suncoast's financial services, and apply for financial products like credit cards.

3.      Despite its unique position as a trusted credit union, Suncoast used its Website to blatantly collect and disclose Consumers' and Customers' (collectively, "Customers") Personal and Financial Information to Third Parties uninvolved in the provision of financial services—entirely without their knowledge or authorization. Suncoast did so by knowingly and secretly configuring and implementing code-based tracking devices ("trackers" or "tracking technologies") into its Website.

4.      Through these trackers, Suncoast disclosed and continues to disclose Personal and Financial Information that Customers input into and accessed on Suncoast's Website. This information includes, without limitation, membership application details including details about users' citizenship, employment status, and residency location, state which issued the Customer's identification, questions Suncoast presents to its applicants, the type of membership a Customer applies for, address information including city and zip code, duration of residency at their current address, details related to membership eligibility, and citizenship status.

5.      Upon information and belief, Suncoast utilized data from trackers to improve and to save costs on its marketing campaigns, improve its data analytics, attract new customers, and generate sales. Suncoast benefited from use of Customers' Personal and Financial Information. Suncoast further allowed the Third

Parties, who are uninvolved in Suncoast's provision of financial services, to profit from its Disclosure of Customers' Private and Financial information. And the Third Parties used Customers' Personal and Financial Information for themselves and disclosed it to fourth parties who also profited off of it. Facebook, for example, will use the data collected from Customers of Suncoast to sell ads to fourth parties who will further profit off of the use of that information

6.     Customers, like Plaintiff and Class Members, simply do not and cannot anticipate that a trusted financial institution will send their Personal and Financial Information to hidden Third Parties (who in turn share with fourth parties), all of whom profit off of it; likewise, when Plaintiff and Class Members used Defendant's Website, they thought they were communicating exclusively with a trusted financial institution.

7.     At no time did Suncoast disclose to Plaintiff or Class Members that it was sharing their Personal and Financial Information with the Third Parties for third- and fourth-party use. Plaintiff and Class Members never signed a written authorization permitting Defendant to send their Personal and Financial Information to the Third Parties who were uninvolved in the provision of financial services. And Suncoast never allowed Plaintiff or Class Members a real opportunity to opt-out of its Disclosure.

8.     Defendant owed a variety of duties, including common law, statutory, contractual, and regulatory duties, to keep Plaintiff's and Class Members' Personal and Financial Information safe, secure, and confidential.

9.     Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Personal and Financial Information, Defendant assumed legal and equitable duties to those individuals to protect and safeguard their information from unauthorized disclosure.

10.     The statutory and regulatory duties Suncoast owed Customers include its obligations under federal law. For example, the GLBA requires that "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C.A. § 6801. Under this federal law, financial institutions like Suncoast are explicitly prohibited from disclosing a Customer's Personal and Financial Information without sufficient advance notification and opt-out opportunity. 15 U.S.C.A. § 6801, *et seq*.

11.     Suncoast ignored all its duties and obligations, including the GLBA's prohibition, by disclosing Customers' Personal and Financial Information without proper advance notification and opt-out rights as required under the GLBA.

12.     Examples of "Personal and Financial Information" included in the GLBA are indistinguishable from the types of information Suncoast disclosed to

Facebook, including, among other things: (a) "[i]nformation a consumer provides to [Defendant] on an application to obtain a loan, credit card, or other financial product or service"; (b) "[t]he fact that an individual is or has been one of [Defendant's] customers or has obtained a financial product or service from [Defendant]"; (c) "information about [Defendant's] consumer . . . disclosed in a manner that indicates that the individual is or has been [Defendant's] consumer"; (d) "information that a consumer provides to [Defendant] or that [Defendant] or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account"; "[a]ny information that a consumer provides to [Defendant] or that [Defendant] or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account; and (e) "any information [Defendant] collect[s] through an Internet 'cookie' (an information collecting device from a web server)." 16 C.F.R. 313.3(o)(2)(i).

13.    Suncoast breached common law, statutory, and contractual obligations to Plaintiff and Class Members by, *inter alia*, (i) failing to adequately review its marketing programs and web based technology to ensure its Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share Personal and Financial Information; (iii) aiding, agreeing, and conspiring with the Third Parties to intercept communications sent and received by Plaintiff and Class Members; (iv) failing to obtain the written consent of Plaintiff and Class Members to disclose their Personal and Financial Information to Third Parties for

Third Party and fourth party use; (v) failing to protect Personal and Financial Information and take steps to block the transmission of Plaintiff's and Class Members' Personal and Financial Information through the use of tracking technology; (vi) failing to warn Plaintiff and Class Members; and (vii) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of its customers' Personal and Financial Information.

14.    Plaintiff seeks to remedy these harms and brings causes of action of (I) Negligence; (II) Negligence Per Se; (III) Invasion Of Privacy (Intrusion Upon Seclusion); (IV) Invasion Of Privacy (Disclosure Of Private Facts); (V) Breach Of Express Contract; (VI) Breach of Implied Contract; (VII) Unjust Enrichment (As Alternative To Contract Claims); (VII) Violation of the Florida Deceptive Consumer Sales Act; (IX) Violation of the Electronic Communications Privacy Act ("ECPA"); (X) Violation of the Electronic Communications Privacy Act (Unauthorized Divulgence by Electronic Communications Service); (XI) Violation of Title II of the Electronic Communications Privacy Act ("Stored Communications Act"); (XII) Violation of the Florida Wiretap Act; and (XIII) Violation of the Computer Fraud and Abuse Act ("CFAA").

15.    Plaintiff brings this action, individually and on behalf of all others similarly situated, for damages and equitable relief.

**PARTIES**

16.    Plaintiff Eliorminia Casanova is a natural person and citizen of Florida, where she intends to remain. Plaintiff Casanova applied for Suncoast's services in approximately April 2024 and is a victim of Defendant's unauthorized Disclosure of Personal and Financial Information.

17.    Defendant Suncoast is a financial cooperative organized and existing under the laws of the State of Florida, with corporate headquarters located at 6801 East Hillsborough Avenue | Tampa, FL 33610.

18.    Suncoast's Registered Agent for Service of Process is Terry L. Hall, Suncoast Credit Union, 6801 East Hillsborough Avenue, Tampa, FL 33680.

19.    Suncoast is a financial institution, as that term is defined by Section 509(3)(A) of the GLBA, 15 U.S.C. § 6809(3)(A).

20.    Suncoast has corporate offices in Tampa, Florida, and maintains physical locations in the state of Florida.

## JURISDICTION AND VENUE

21.    This Court has personal jurisdiction over Defendant because Defendant operates, conducts, engages in, or carries on a business in this State; it maintains corporate offices in this state; and committed tortious acts in this State.

22.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than one hundred

(100) members in the proposed Classes, and at least one member of the Classes is a citizen of a state different from Defendant.

23.    This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because it arises under the laws of the United States. The Court has supplemental jurisdiction over Plaintiff's claims arising under state law pursuant to 28 U.S.C. § 1367.

24.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District and continue to occur in this District.

## COMMON FACTUAL ALLEGATIONS

### A. Suncoast Collects Personal and Financial Information Under the Guise of Protecting it

25.    Suncoast services allow its Customers to "[b]ank securely from anywhere" including online through its Website. Defendant encourages customers to use its Website to, for example, learn about Suncoast and its services,[3] view educational financial resources,[4] become a Suncoast Credit Union member,[5] apply

---

[3]    *See Membership Benefits and Perks*, https://www.suncoast.com/Why-Suncoast/Membership-Benefits (last visited Apr. 9, 2025).

[4]    *See mPower eLearing*, https://www.suncoast.com/Why-Suncoast/Membership-Benefits (last visited Apr. 9, 2025).

[5]    *See Welcome to a new financial experience – Suncoast Credit Union*, https://join.suncoastcreditunion.com/?_gl=1*g5tpeu*_gcl_au*MTQ3MTk2OTIzOS4xNzQxMjg yNzE2*_ga*MzQ4Njk1MjUuMTc0MTI4MjcxNg..*_ga_WN5BY540YR*MTc0NDIyNTY5Ni4 3LjEuMTc0NDIyODMzMi4xNy4wLjA (last visited Apr. 9, 2025).

for and access checking and savings accounts,[6] apply for and access loans and credit cards,[7] and much more.[8]

26.    Defendant promotes the comprehensive functionality and use of its Website in service of its own goal of increasing profitability. In furtherance of that goal, Defendant purposely and secretly installed the Third Parties' online tracking technology onto its Website to gather information about Customers.

27.    Suncoast proclaims, "we are committed to respect[ing] your privacy and safeguard[ing] that information."[9]

28.    Instead of respecting Customer privacy and safeguarding their information, Suncoast utilized the information it collected to market its services and bolster its profits by surreptitiously diverting the information to Third Parties like Facebook.

29.    But Defendant did not only collect information for its own use; Suncoast also shared—and continues to share—Customers' information, including Personal and Financial Information, with the unauthorized Third Parties who then

---

[6] *See Checking & Savings*, https://www.suncoast.com/For-You/Checking-and-Savings (last visited Apr. 9, 2025).
[7] *See Loans and Credit Cards*, https://www.suncoast.com/For-You/Loans-and-Credit-Cards (last visited Apr. 9, 2025).
[8] *See generally* the Website.
[9] *See Privacy Policy*, https://www.suncoast.com/Privacy-Policy (last visited Apr. 9, 2025) ("*Privacy Policy*") (attached to the Complaint as Exhibit A).

use it for their own benefit and to benefit fourth parties who are even further removed from the Customers.

**B. Third Parties and Trackers: Collectors and Profiteers of Personal and Financial Information**

30.    The invisible Third Party online tracking technologies installed by Suncoast on its Website gathers a vast assortment of Customer data. The installation of these trackers—and thus their transmission of data—is in Suncoast's exclusive control.

31.    When an individual accesses a webpage containing online tracking technology from a Third Party, the trackers instantaneously and surreptitiously duplicate communications with that webpage and send them to the Third Party. The information travels directly from both the user's browser and the webpage owner's server and then on to the Third Party's server, based off instructions from the Third Party's tracker. The communications and information transmitted via these trackers are entirely in Defendant's control; Customers trust Suncoast with the information they input on Suncoast's Website, and Suncoast is in complete and exclusive control of its Website and the data input therein. The transmission of Customers' data <u>only</u> occurs on webpages that contain tracking technology.

32.    Online tracking technologies may not be deleted from an individual's device; they are built into a webpage, and a webpage user has no control or warning over their presence or data collection. Third party trackers cause information to flow

directly from the website user's browser and the website owner's server to the Third Party itself. A webpage user cannot prevent or even detect this transmission of data.

33.     Accordingly, without any knowledge, authorization, or action by a user, a website owner who has installed Third Party trackers is utilizing website source code to commandeer its users' computing devices and web browsers, causing them to invisibly re-direct the users' communications to Third Parties.

34.     In this case, Defendant employed the Third Party trackers to intercept, duplicate, and re-direct Plaintiff's and Class Members' Personal and Financial Information to the Third Parties contemporaneously, invisibly, and without the customer's knowledge.

35.     Consequently, when Plaintiff and Class Members visited Defendant's Websites and communicated their Personal and Financial Information, that information was simultaneously intercepted and transmitted to the Third Parties.

36.     The Third Party trackers do not provide any substantive content on Suncoast's Website. Rather, their only purpose is to collect information to be used for the Third Party and fourth parties' marketing and sales purposes.

37.     The Facebook or Meta Pixel, for example, "tracks the people and type of actions they take" on a website.[10] It can be used to gather customer data, identify

---

[10] *Retargeting*, Meta, https://www.facebook.com/business/goals/retargeting (last visited Aug. 11, 2024).

customers and potential customers, target advertisements to those individuals, and market products and services. This includes when a user visits a particular webpage, clicks a button, fills out a form (including the information from the form like employment information, citizenship, etcetera), IP addresses, web browser information, page location, any custom events set by the website owner, the tracker ID, and more.[11] Facebook does all of this by using the Meta Pixel to send "events" to its server.

38.    Once the data is collected via the Meta Pixel, Facebook aggregates it to build its own massive, proprietary dataset, which Facebook then uses to find new customers, drive sales, and understand ad impact. This is all to the benefit of the website owner, like Suncoast, Facebook as the third party, and other fourth parties, all of whom use the information for targeted marketing campaigns. Targeting works by allowing fourth parties to direct their ads at particular "Audiences," subsets of individuals who, according to Facebook, are the "people most likely to respond to your ad."[12]

---

[11] *See, e.g.*, *Meta Pixel*, Meta for Developers, https://developers.facebook.com/docs/meta-pixel/ (last visited Aug. 11, 2024); *Specifications for Facebook Pixel Standard Events,* Meta, https://www.facebook.com/business/help/402791146561655 (last visited Aug. 11, 2024); *see also Facebook Pixel, Accurate Event Tracking, Advanced*, Meta for Developers https://developers.facebook.com/docs/facebook-pixel/advanced/ (last visited Aug. 11, 2024).

[12] *Audience Ad Targeting*, Meta, https://www.facebook.com/business/ads/ad-targeting (last visited Aug. 14, 2023).

39.    Data harvesting is big business for Facebook; it drives Facebook's advertising sales, which are its profit center. In 2023, Facebook generated nearly $135 billion in revenue, roughly 98% of which was derived in advertising revenue alone space.[13] This business model is not limited to Facebook. Data harvesting one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

40.    On information and belief, the trackers Defendant installed from other Third Parties, including Google, Google Analytics, DoubleClick Ads, Siteimprove, AdTheorent, Nextdoor, AdsWizz, TikTok, Sitecore, AlphaRank, BlueShift, Adroll, MNTN, Microsoft Clarity, The Trade Desk, Centro/SiteScout Basis, Tapad, Extole, and New Relic, work similarly to the Meta Pixel and likewise transmitted Plaintiff's and the Class Members' Personal and Financial Information without Plaintiff's and Class Members' knowledge or authorization.

41.    The Google trackers allow Defendant to track and share with Google (1) who uses Suncoast's Website; (2) what is performed on the Website; (3) when

---

[13] *Meta Reports Fourth Quarter and Full Year 2023 Results*, Facebook https://investor.fb.com/investor-news/press-release-details/2024/Meta-Reports-Fourth-Quarter-and-Full-Year-2023-Results-Initiates-Quarterly-Dividend/default.aspx (last visited Aug. 8, 2024).

users visit the Website; (4) where on the Website users perform these actions; and (5) how users navigate through the Website to perform these actions. The Google trackers also record events that include data such as users' IP addresses, cookies, and "browser fingerprints,"[14] all of which can be used to identify the user. Google gathers this information using trackers embedded on Suncoast's Website and generates corresponding reports.[15] Google Analytics and DoubleClick are part of the suite Google uses to collect all of this.[16] Google's collection of this data "enables advertisers to more effectively create, manage and grow high-impact digital marketing campaigns."[17]

42.    The Microsoft tracker allows Defendant to "[t]rack what your customers are doing after they click on your ad."[18] According to Microsoft, the

---

[14] "Browser fingerprinting happens when websites use special scripts to collect enough information about you — such as your browser, timezone, default language, and more — that they can uniquely identify you out of the sea of other internet users." *What is Browser Fingerprinting and How Can You Prevent It?*, AVAST, https://www.avast.com/c-what-is-browser-fingerprinting#:~:text=Browser%20fingerprinting%20happens%20when%20websites,sea%20of%20other%20internet%20users. (last visited Apr. 23, 2025). Because browser fingerprints differ from cookies, "even when cookies are disabled, fingerprints can be used to fully or partially identify users or devices." Pau, Kiu Nai, *et al.*, *The Development of Data Collection and Browser Fingerprinting System*, NAT. LIBRARY OF MEDICINE (Mar. 13, 2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10057587/#:~:text=A%20browser%20fingerprint%20is%20described,system%2C%20and%20other%20current%20settings.

[15] *See generally*, *A big list of what Google Analytics can & cannot do*, MarketLyrics, avail. at https://marketlytics.com/blog/list-of-things-google-analytics-can-and-cannot-do/.

[16] *See DoubleClick Digital Marketing Suite,* Google Developers, https://developers.google.com/app-conversion-tracking/third-party-trackers/doubleclick (last visited Aug. 8, 2024).

[17] *See DoubleClick Digital Marketing*, Google Help, https://support.google.com/faqs/answer/2727482?hl=en (last visited June 26, 2024).

[18] *See Microsoft Advertising*, Microsoft.com, https://about.ads.microsoft.com/en/tools/performance/conversion-

tracker "records what customers do on your website . . . [and] will collect data that allows you to track conversion goals and target audiences with remarketing lists."[19]

43.    As Siteimprove states, "Siteimprove Analytics gives you powerful insights into visitor behavior and website performance with intuitive dashboards and easy-to-use reporting, so you can make data-driven decisions to consistently deliver business results across teams."[20]

44.    AdTheorent "uses its advanced machine learning platform and privacy-forward solutions" to identify and target individuals based on the data they input on websites like Defendant's.[21]

45.    Nextdoor tracks activity on the sites that install it, allowing it to track information and display personalized ads on its website and other sites.[22]

46.    AdsWizz has a "digital ad-buying platform that . . . delivers ads . . . and maximizes the impact of [] advertising campaigns.[23]

---

[19] tracking#:~:text=Universal%20Event%20Tracking%20(UET)%20is,target%20audiences%20with%20remarketing%20lists (last visited June 26, 2024).

[19] *Id.*

[20] *See Siteimprove*, https://www.siteimprove.com/platform/analytics/ (last acc. Nov. 18, 2024).

[21] *See About AdTheorent*, https://www.adtheorent.com/about (last visited Dec. 16, 2024).

[22] *See      Personalized      Ads      and      Privacy      Controls*, https://help.nextdoor.com/s/article/Personalized-Ads-and-Privacy-Controls?language=en_US#:~:text=The%20shop%20could%20provide%20an,emails%20of%20our%20members%20to (last visited Apr. 9, 2025).

[23] *See Advertisers - AdsWizz*, https://www.adswizz.com/advertisers/ (last visited Apr. 9, 2025).

47.     TikTok owns the TikTok Pixel, which "is a piece of code that you can place on your website that allows you to share website events with TikTok."[24] The US Government has banned TikTok in the United States due to its illegal and secret harvesting of PII.[25] The TikTok Pixel collects and uses IP addresses as part of its standard tracking behavior.

48.     Sitecore "enables [websites] to track and identify contacts and their interactions," enabling Sitecore to personalize and target Defendant's Customers with advertisements.[26]

49.     AlphaRank gives website owners "a competitive edge" by feeding the information it tracks through its "AI teammate."[27]

50.     BlueShift tracking "help[s] [websites] to analyze the impact of your campaigns" with "tracking links" that "collect customer data."[28]

---

[24] *See Set Up and Verify Pixel,* TikTok.com, https://ads.tiktok.com/help/article/get-started-pixel (last visited Apr. 9, 2025).

[25] *See TikTok accused of secretly gathering user data and sending it to China*, https://www.cnet.com/news/privacy/tiktok-accused-of-secretly-gathering-user-data-and-sending-it-to-china/   (Dec. 2, 2019); *Appeals court rejects TikTok bid to overturn possible US ban*, https://apnews.com/article/tiktok-ban-court-ruling-china-6bfd505295ad44126df0544fc083d6a6 (Dec. 6, 2024).

[26]     *See    Web    tracking    |    Sitecore    Documentation*, https://doc.sitecore.com/xp/en/developers/latest/sitecore-experience-platform/web-tracking.html (last visited Apr. 9, 2025).

[27] *See AlphaRank – AI SEO Optimizer To Boost Traffic*, https://www.alpha-rank.com/ (last visited Apr. 9, 2025).

[28]     *See    Link    tracking    –    Help    Center*, https://help.blueshift.com/hc/en-us/articles/20799831110931-Link-tracking (last visited Apr. 9, 2025).

51.    Adroll connects data from multiple different trackers, including Google and Segment, and use that information to "run AdRoll campaigns."[29]

52.    The Trade Desk tracker allows websites to "create, manage, and measure your digital advertising campaigns and create your own competitive advantage."[30]

53.    Centro/SiteScout Basis is a tracker that collects and analyzes data to help its customers improve their advertising campaign performance.[31]

54.    Tapad "enables marketers to identify a brand customer or related household across multiple devices" which helps website owners to "maximize their digital marketing investment."[32]

55.    Extole charges its customers for its tracking services, which "results in higher-quality, higher-performing programs and gives you better visibility into results, customer behaviors, advocate relationships, and audience targeting."[33]

---

[29] *See Sharing Tracking Data to AdRoll*, https://help.adroll.com/hc/en-us/sections/202483398-Sharing-Tracking-Data-to-AdRoll (last visited Apr. 9, 2025); *TRYTN Integration: Track your TRYTN page and event visitors on AdRoll*, https://help.adroll.com/hc/en-us/articles/360044693632-TRYTN-Integration-Track-your-TRYTN-page-and-event-visitors-on-AdRoll (last visited Apr. 9, 2025).

[30] *TTD Partner Portal*, https://partner.thetradedesk.com/v3/homepage (last visited Apr. 9, 2025).

[31] *See Marketer Solutions*, https://basis.com/technology/dashboards (last visited Apr. 9, 2025)

[32] *See Tadpad | Homepage*, https://www.tapad.com/ (last visited Apr. 9, 2025).

[33] *See Platform | Extole*, https://www.extole.com/platform/ (last visited Apr. 9, 2025).

56.    "New Relic browser monitoring helps you understand website performance and user behavior by monitoring real user data. It tracks page load times, network requests, JavaScript errors, user interactions, and more."[34] According to Google, "New Relic's software-as-a-service (SaaS)-based APM tool is designed to provide deep visibility into your app's performance, all the way from the end-user experience, through servers, across distributed applications, and down to the line of code."[35] New Relic's platform collects "performance data," or "telemetry data" from users' "services using agents" [or] "…a file or a few lines of code that collects data on your service and sends it to our platform for analysis." "… [New Relic's] agents keep track of the service's performance by monitoring metrics such as response times and error rates. By analyzing this data, you can gain insights into the functioning of your service and identify areas for improvement. An agent is first installed in your environment with a default configuration. The process of installation, setup, and instrumentation can vary. It depends on the service you want to collect data from."[36]

---

[34] *See Get Started With* New Relic, https://docs.newrelic.com/docs/new-relic-solutions/get-started/intro-new-relic/#:~:text=New%20Relic%20browser%20monitoring%20helps,app's%20performance%20or%20backend%20errors (last visited Apr. 9, 2025).

[35] *See          New          Relic          –          Marketplace,* https://console.cloud.google.com/marketplace/product/newrelic-saas/new-relic (last visited Nov. 18, 2024).

[36] *Id.*

57.     Each tracker installed on Defendant's website also sets its own cookies to help identify users on Defendant's Website. And the event data sent via each tracker includes the user's IP address as part of the standard HTTP request.

58.     And, in addition to using its own cookies, Google Analytics also integrates with DoubleClick, meaning DoubleClick's cookies can be linked to a user's Google account, enabling cross-site and cross-device tracking.

### C. Suncoast Used Trackers to Unauthorizedly Disclose Personal and Financial Information

59.     On information and belief, Suncoast installed each of these trackers, through which Suncoast transmitted Customers' communications with Suncoast's website and thus their Personal and Financial Information to the Third Parties without Customers' knowledge or authorization. Suncoast reports information to the Third Parties when users apply for Suncoast memberships and services, informing third parties about the information that Customers input on the application, including personally identifiable information that users provide to Suncoast as part of the application processes.

60.     On information and belief, the trackers installed on Suncoast's website also collect and share user data and information when the users access Suncoast's online banking portal.

61.     On information and belief, since at least July 14, 2020, and at least as recently as March 12, 2025, Suncoast has tracking technologies installed on its Website.

62.     Accordingly, Suncoast disclosed its Customers'—including Plaintiff's and the Class Members'—data and Personal and Financial Information to the Third Parties, like Facebook, beginning at or before July 14, 2020, and at least up to March 12, 2025.

63.     By way of example, as configured as of March 12, 2025, Defendant's Facebook Pixel and/or its other tracking technologies, disclosed significant information to Facebook, including information such as IP addresses, browser fingerprints, and cookies that can link to the user's Facebook account and can otherwise be used to identify and track specific users.

   i.     *Suncoast Installed Meta Pixels to Track Suncoast's Membership Application Information.*

64.    Before a user can access their account or any applications on Suncoast's website, they must create a Suncoast Credit Union Account and become a Suncoast member.



65.    Because Customers must apply for a membership before they can apply for any other services, such as checking and savings accounts, the same information is disclosed no matter which service a Customer is applying for.

66.    Customers can apply for a Suncoast membership through an online application. When users fill out the form, Suncoast discloses users' details from their membership applications to third parties. The information Suncoast discloses includes certain application responses, including details about users' citizenship, employment status, and residency location.

67.    Additionally, Suncoast transmits information about questions that Suncoast presents to its applicants. The application includes questions about what type of account the applicant desires, the applicants' identity, and the applicants' membership qualification criteria.

68.    For example, when a Customer applies for a personal account, Suncoast reveals Personal and Financial Information. By way of example, as the applicant loads the application, Suncoast reports that the user clicked "Join Now" to Google Analytics and AlphaRank. The figures below demonstrate this:





69.     Suncoast also sends events to MNTN, Google Analytics, DoubleClick, AdRoll, TikTok, NextDoor, Facebook, AlphaRank, GoogleAds, and AdTheorent reporting that the user is on the page, "join.suncoastcreditunion.com."  The figures below demonstrate this:





70.     The first question on the application is whether the user would like a personal or a business membership. Suncoast reports the user's selection to Google Analytics, Facebook, and AlphaRank. For example, when the applicant chooses a personal membership, Suncoast informs Google Analytics, Facebook, and AlphaRank that the user selected the personal membership option. The figures below demonstrate this:





71.    The next question on the application relates to the applicant's citizenship status. Suncoast reports the applicant's citizenship status to both AlphaRank and Google Analytics. As the user selects their citizenship status, Suncoast reports to AlphaRank that the user is instructed to "Select Citizenship Type" and that the user selected that they were a "U.S. Citizen." The figure below demonstrates this:



72.     Suncoast also reports that response to Google Analytics disclosing that the user selected that they have the "Citizenship Type – U.S. Citizen.". The figures below demonstrate this:





73.    Then Suncoast sends a SubscribedButtonClick event to Facebook indicating that the user clicked "Continue" on the "join.suncoastcreditunion.com" page when the user clicks to move to the next page. The figure below demonstrates this:



74. Next, Suncoast prompts the applicant to provide their basic information, including their name, email address, and birthday. Suncoast informs Google Analytics as the user clicks to submit their first name, last name, suffix, and email, revealing that the user clicked to get their "membership_application_started" on "join.suncoastcreditunion.com," and that the user was prompted for their "Name, Email, DOB, Phone." The figures below demonstrate this:





75.     Suncoast further reports to AlphaRank the type of information it collects, but not the content entered, from the applicant at this step. The figures below demonstrate this:





76.     Additionally, Suncoast informs AlphaRank the type of suffix that the user selects. For example, when the user submits "JR" as their suffix, Suncoast sends an event to AlphaRank revealing that the user selected "JR" for the field "namesuffix." The figure below demonstrates this:



77.    As the user clicks to proceed, Suncoast informs Blue Shift that the user got the Suncoast "membership_application_started" and informs Facebook and TikTok that the user clicked to get their "Membership Application Started" on "join.suncoastcreditunion.com". The figures below demonstrate this:







78.    Next, Suncoast requests the user's address information. Suncoast reports the user's city and zip code information to Facebook. For example, if the user provides that they live in Austin, Texas with the zip code 78702, Suncoast transmits these details to Facebook. The figures below demonstrate this:





79.    Suncoast also continues to inform AlphaRank, Google, and Facebook about the type of information that Suncoast requested from the user. The figures below demonstrate this:





80.    Suncoast also reports the user's response about their duration of residency at their current address to AlphaRank. For instance, if the user answers that they have lived at their current address for four or more months, Suncoast transmits an event to AlphaRank, reporting that the user selected "4 months or more" after they selected a field with their "street-address" information. The figure below demonstrates this:



81.    Next, Suncoast prompts the user for details that relate to their membership eligibility. For example, when the applicant selects that they are eligible for membership due to their worship in Miami-Dade County, Suncoast reports to AlphaRank that the user selected "Miami-Dade." The figure below demonstrates this:



82.    Then as the user continues their application to the identity verification step, Suncoast reveals the user's citizenship status, the state which issued the user's identification, and the user's employment status to AlphaRank. For example, when the user selects that they are a U.S. citizen, Suncoast informs AlphaRank that the user chose "U.S. Citizen," for the field "citizenship-type." The figure below demonstrates this:



83.    Likewise, Suncoast reports the user's answer about the type of ID used for verification to AlphaRank. For instance, when the user selects their driver's license as the form of ID, Suncoast reports that the user selected "Driver's License," as the "id-type," and also revealing the state that issued the user's ID as well. The figure below demonstrates this:



84.     Furthermore, when the user selects Texas as the state that issued their ID, Suncoast informs AlphaRank that the user selected "Texas" as the "id-issuing-location." The figure below demonstrates this:



85.    Lastly, Suncoast also reports the applicant's employment status to AlphaRank. When the user selects that they are unemployed, for example, Suncoast reports this to AlphaRank, disclosing that the user chose "Unemployed," as their "Employment Status." The figure below demonstrates this:



86.     As the applicant arrives at the penultimate step of the application where

they are prompted to review their inputted information, Suncoast transmits an event

to SiteImprove, revealing that the user is on the "Membership Application." The

figure below demonstrates this:



87.    Suncoast reveals the user's previously input city and zip code information to Facebook again during this step. The figure below demonstrates this:



88.    Next, as the user clicks to continue to the final step of the application, Suncoast sends an event to Google Analytics, reporting that the user is on "Step 2 –

Identity," for "Personal Information Confirm – Confirm." The figure below demonstrates this:



89.    Likewise, Suncoast sends an event to Facebook, reporting that the user clicked "Confirm." This event also includes the user's previously input city and zip code information again. The figure below demonstrates this:



90.     Additionally, Suncoast informs SiteImprove that the user is on the "Membership Application," and clicked for "Identity Confirm." The figure below demonstrates this:



91.     Finally, Suncoast asks the applicant to certify under penalties of perjury that, among other things, the identity information they provided in the application is accurate. Suncoast reports the user's response. When a user selects that they disagree, for example, Suncoast sends Google Analytics, Facebook, and AlphaRank

events revealing that the user selected "I Disagree." The figures below demonstrate this:





92.     Upon information and belief, every page in the application flow on Defendant's website includes trackers that collected and shared events that include the Customer's IP addresses, browser fingerprints, and cookies.

ii.     *Third Parties Further Share the Data and Information Collected from Trackers Installed on Suncoast's Website with Fourth Parties.*

93.     In addition to using the data for their own purposes, the third parties that obtain Customer data and information from trackers installed on Suncoast's website further profit from Suncoast's improper sharing practices by selling Customers' data to fourth parties.

94.    As one study found, "on average, companies that allow external sharing of [] data assets have data that has been exposed to 42 4th-party domains."[37]

95.    Consequently, a fourth party that did not have a tracker directly installed on Suncoast's website may obtain and use information collected via third-party trackers to provide direct advertisements to Customers on the fourth party's platform.

96.    One common recipient of Customers' collected data is Facebook.

97.    For example, Facebook and Google have engaged in practices that allowed for the sharing or accessibility of user data between their platforms.[38] Because of this, advertisements on Facebook may reflect information collected via a Google tracker, either because of information shared directly or indirectly between the companies.

---

[37] Adam Gavish, *Your 3rd Party Collaborators Share Your Company's Data with 4th Parties*, DoCONTROL (Feb. 27, 2025), https://www.docontrol.io/blog/your-3rd-party-collaborators-share-your-company-data-with-4th-parties#:~:text=What%20is%204th%2DParty%20Data,side%20effect%20of%20of%20SaaS%20collaboration.

[38] *See* Steven Musil, *Facebook gave tech giants more access to users data than it said*, CBSNEWS (Dec. 19, 2018), https://www.cbsnews.com/news/facebook-gave-tech-giants-more-access-to-users-data-than-it-said-new-york-times/ (last visited Apr. 24, 2025); Steven Musil, *Facebook acknowledges it shared user data with dozens of companies* (Jul. 1, 2018), https://www.cnet.com/tech/tech-industry/facebook-acknowledges-it-shared-user-data-with-dozens-of-companies/ (last visited Apr. 24. 2025); Paresh Dave and Katie Paul, *Google secretly gave Facebook perks, data in ad deal* (Dec. 17, 2020), https://www.reuters.com/article/technology/google-secretly-gave-facebook-perks-data-in-ad-deal-us-states-allege-idUSKBN28Q37G/ (last visited Apr. 24, 2025).

98.    Facebook and Google both act as data brokers, meaning they collect data, compile it into datasets, and sell it to third parties.[39] Two other popular data brokers are Acxiom and Oracle Data Cloud ("Oracle"). Facebook and Google have been known to buy information from, and sell information to, such data brokers.[40]

99.    Because of this, one company's tracker (e.g., Google Analytics) may collect information, compile it into a dataset (owned by Google), and act as a data broker to sell it to a third-party (e.g., Facebook), which uses the information to advertise for various parties (like other financial institutions) on its own platform.[41] Alternatively, one company's tracker (e.g., Google Analytics) may collect information, compile it into a dataset (owned by Google), and act as a data broker to sell it to a fourth-party advertiser (e.g., another financial institution), which uses the information to advertise for on other platforms (e.g., Facebook).[42] Or, one company's tracker (e.g., Google Analytics) may collect information, sell either the

---

[39] *See* Jessie G Taft, *Facebook and Google Are the New Data Brokers* (Dec. 18, 2018, updated Jan. 5, 2021), https://dli.tech.cornell.edu/post/facebook-and-google-are-the-new-data-brokers (last visited Apr. 24. 2025).

[40] *See* Kalev Leetaru, *The Data Brokers So Powerful Even Facebook Bought Their Data* (Apr. 05, 2018), https://www.forbes.com/sites/kalevleetaru/2018/04/05/the-data-brokers-so-powerful-even-facebook-bought-their-data-but-they-got-me-wildly-wrong/ (last visited Apr. 24. 2025).

[41] *See* Don Marti, *et. al.*, *Who Shares Your Information With Facebook?* (Jan. 2024), https://innovation.consumerreports.org/wp-content/uploads/2024/01/CR_Who-Shares-Your-Information-With-Facebook.pdf, p. 16 (last visited Apr. 24. 2025). (explaining how Facebook uses aggregated data from external data brokers to target users on its platform).

[42] *See* Don Marti, *et. al.*, *Who Shares Your Information With Facebook?* (Jan. 2024), https://innovation.consumerreports.org/wp-content/uploads/2024/01/CR_Who-Shares-Your-Information-With-Facebook.pdf, p. 16 (last visited Apr. 24. 2025).

raw data or a compiled dataset to a third-party data broker (e.g., Acxiom or Oracle),

which third party data broker sells the information to a fourth party (e.g., Facebook),

which uses the information for still other parties' targeted advertising.[43] In any event,

the basic idea and results are the same. Google Analytics tracks and discloses

information to fourth parties that use that data and information to advertise a variety

of products on a variety of platforms.

100.    The information that data brokers like Acxiom and Oracle buy and

compile from trackers (like Facebook's and Google's tackers) is inherently sensitive.

## D. Suncoast Maintains Ambiguous, Disingenuous, and Deceptive Privacy Policies That Fail to Sufficiently Disclose, Notify, Or Provide Opportunity to Opt-Out of the Disclosure

101.    Customers never consented, agreed, authorized, or otherwise permitted

Defendant to intercept their Personal and Financial Information or to use or disclose

it for third-party marketing and profit purposes. Customers were never provided with

any written notice that Defendant disclosed their Personal and Financial Information

to Third Parties (who then allowed fourth parties to use it for profit), nor were they

provided means of opting out of such disclosures.

102.    Customers relied on Defendant to keep their Personal and Financial

Information confidential and securely maintained and to use this information only

---

[43] *See* Kalev Leetaru, *The Data Brokers So Powerful Even Facebook Bought Their Data* (Apr. 05, 2018), https://www.forbes.com/sites/kalevleetaru/2018/04/05/the-data-brokers-so-powerful-even-facebook-bought-their-data-but-they-got-me-wildly-wrong/ (last visited Apr. 24. 2025).

for the purpose of providing legitimate financial services. Customers relied on Defendant to make only authorized disclosures of this information.

103. Furthermore, Defendant actively misrepresented it would preserve the security and privacy of Customers' Personal and Financial Information.

104. The contracts that Suncoast has with its Customers include Suncoast's "Privacy Policy,"[44]  and "Privacy Notice"[45] that it maintains on its Website. When customers apply for a Suncoast membership, Suncoast also points Customers to the "Clutch Privacy Policy"[46] (collectively with the Privacy Policy and Privacy Notice, "Privacy Policies").

105. "Suncoast Credit Union and its affiliates pledge to protect your privacy" and tells its Customers that "[i]t is important for you to know that Suncoast Credit Union does not sell member information."[47] But Suncoast fails to "protect" Customers' information, and instead sells member information to Third Parties (and eventually fourth parties) uninvolved in providing financial services to Plaintiff and Class Members and without Customers' authorization or consent.

106. Suncoast's Privacy Policy promises Customers:

---

[44] *Privacy Policy* (Exhibit A).

[45] *Privacy Notice*, https://edge.sitecorecloud.io/suncoastcre57dd-suncoast-suncoastprod-d848/media/Project/suncoast/Imported/Files/PrivacyNotice.pdf (last visited Apr. 9, 2025) (Attached to the Complaint as Exhibit B).

[46] *See Create Your Account*, https://apply.suncoast.com/account-opening (last visited Apr. 30, 2025) and *Clutch Privacy Policy*, https://apply.suncoast.com/privacypolicy (last visited Apr. 30, 2025) (Attached to the Complaint as Exhibit C).

[47] *Privacy Policy* (Exhibit A).

- At Suncoast Credit Union, trust has always been the foundation of our relationship with our members.
- Because you trust us with your financial and other personal information, and we believe that all personal and financial information specific to you that you provide through any channel constitutes personal information, we are committed to respect your privacy and safeguard that information.
- In order to preserve that trust, Suncoast Credit Union and its affiliates pledge to protect your privacy by following the practices outlined below.
- It is important for you to know that Suncoast Credit Union does not sell member information.
- This policy covers member information, which means personally identifiable information about a member or a member's current or former relationship with Suncoast Credit Union.
- Keeping financial information secure is one of our most important responsibilities.
- We value your trust and handle information about you with care.
- We limit access to member information to those employees who need to know that information in order to provide products and services to you or to maintain your account. Article XVI, Section 2 of the Suncoast Credit Union by-laws requires its officers, directors, members of committees and employees to "hold in confidence all transactions of this credit union with its members and all information respecting their personal affairs."
- In addition, we maintain physical, electronic and procedural safeguards to protect member information.
- We also continually assess new technology for protecting information and upgrade our systems when appropriate.
- To protect our members' privacy, we only work with companies that agree to maintain strong confidentiality protections and abide by the Credit Union's Privacy Policy and use the information only to provide those services prescribed by Suncoast Credit Union.
- Other than the disclosures referenced above, Suncoast Credit Union will not release, share or sell your nonpublic personal information to any unaffiliated third parties.
- A "cookie" is a small test file placed on your hard drive by our web server that helps our site to be much more intuitive when you request

information. **We do not use the information collected by these "cookies" for any other purposes.**

107.    Suncoast's Privacy Notice explains that "[f]ederal law gives consumers the right to limit . . . sharing."[48] Suncoast's Privacy Notice represents:

> Federal law also requires us to tell you how we collect, share, and protect your personal information . . . The types of personal information we collect and share depend on the product or service you have with us. . . . . This information can include:
> - Social Security number
> - Account balances
> - Transaction or loss history
> - Credit history
> - Credit scores
> - Checking account information[49]

But the types of personal information that Suncoast collects and shares does *not* depend on the product or service a Customer has with it. Instead, Suncoast indiscriminately collects and shares Customer information without regard to the product or service a Customer has with Suncoast.

108.    Suncoast lists the "[r]easons we can share your personal information" which includes whether Suncoast shares, "reasons" Suncoast chooses to share, and whether Customers can "limit this sharing."[50] Those reasons include "our everyday business purposes-such as to process your transactions, maintain your accounts(s), respond to court orders and legal investigations, or report to credit bureaus"; "For

---

[48] *Privacy Notice* (Exhibit B)*.*
[49] *Id.*
[50] *Id.*

our marketing purposes – to offer our products and services to you"; "For joint marketing with other financial companies"; "For our affiliates' everyday business purposes – information about your transactions and experiences"; "For our affiliates' everyday business purposes – information about your creditworthiness"; "For our affiliates to market to you"; and "For our nonaffiliates to market to you."[51]

109.    Suncoast represents that while it shares for "our affiliates to market to you," and for "joint marketing with other financial companies," it also represents that "[w]e don't share" Customer information for "nonaffiliates to market to you" or for "our affiliates' everyday business purposes."[52]

110.    Suncoast represents that while it shares information for "affiliates to market to you," Customers can "limit this sharing" for "affiliates to market to you."[53]

111.    Suncoast defines an Affiliate as "Companies related by common ownership or control. They can be financial and nonfinancial companies."[54] Suncoast specifies that its affiliates include companies that share the Suncoast name like "Members Title Agency, LLC; Members Insurance Center, LLC; and Suncoast Realty Solutions, LLC [and] Others, such as: Suncoast Credit Union Foundation."[55]

---

[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.*

Third Parties like Facebook do not have an Suncoast Credit Union name and are not Suncoast's affiliates.

112.   Joint marketing is "A formal agreement between nonaffiliated financial companies that together market financial products or services to [Customers]."[56] Suncoast's "joint marketing partners include insurance companies, trust companies, securities broker-dealers, and credit card companies."[57] Certainly, Third Parties like Facebook do not meet this definition.

113.   Suncoast finally defines "nonaffiliates," which are "[c]ompanies not related by common ownership or control."[58] "They can be financial and nonfinancial companies."[59] **Suncoast specifically promises Customers that "Suncoast Credit Union does not share with nonaffiliates so they can market to you."**[60]

114.   Finally, the Clutch Privacy Policy notes that it may collect private information in a variety of ways.[61] But it also lists the uses for this information—none of which include marketing for third parties or sale of Customer information:

> The purposes for which we may use your information include to:
> - **Provide you with our Services**: We use your personal information to display services and products to you and to determine eligibility for financial and protection products and process transactions and payments, fulfill orders, and verify customer information.

---

[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] Clutch Privacy Policy (Exhibit C).

- **Respond to your questions or requests concerning the Services**: Communicate with you about products and services that may be offered to you, including by sending you announcements, updates, security alerts, and support.
- Fulfill the terms of any agreement you have with us.
- Fulfill your requests for our Services or otherwise complete a transaction that you initiate.
- Improve our artificial intelligence and machine learning.
- Deliver confirmations, account information, notifications, and similar operational communications.
- Improve your user experience and the quality of our products and Services.
- Comply with legal and/or regulatory requirements
- We may use your personal information to comply with applicable laws, lawful requests, and legal process, such as respond to subpoenas or requests from government authorities; protect our, your, or others' rights, privacy, safety, or property; audit our internal processes for compliance with legal and contractual requirements or out internal policies; and enforce the terms and conditions that govern our Platform.
- Aggregate and deidentify information.
- Count and recognize visitors to the Services.
- Analyze how visitors use the Services and its features;
- Improve the Services and enhance users' experiences with the Services
- Create new products and services or improving our existing Services.
- Enable additional analytics and research concerning the Services.
- Manage our business.
- Detect and prevent fraud.

115.    Furthermore, the policy states that it shares information with third parties for "a Business Purpose." None of "Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose" include marketing or sale of personal information. And none of the Third Parties described include social media companies like Facebook and Google. [62]

---

[62] *Id.*

116.   Customers reasonably understand that Suncoast will securely maintain the Personal and Financial Information they entrusted to it and protect that information from being shared or utilized by Third Parties (and fourth parties) that have nothing to do with Suncoast or its services. Suncoast's Privacy Policies only reinforced this reasonable understanding.

117.   Nowhere in the policies does Suncoast disclose its use of Customer Personal and Financial Information for Third Party and fourth party marketing, nor does Suncoast disclose that it will collect and share data that can be used to identify the user, such as the user's IP address or browser fingerprint. Instead, Suncoast clearly promises customers that it does not share with nonaffiliates so they can market to Customers.

118.   Nowhere in the policies does Suncoast disclose that it has installed third-party trackers that collect and share information with third and fourth parties, or that the trackers can link the data collected via Suncoast's Website to the Customer's Facebook account, enabling cross-site and cross-device tracking.

119.   Suncoast's failure to safeguard the privacy of Customers' Personal and Financial Information as agreed in its Privacy Policies is even more egregious here, as Suncoast also fails to provide Customers with sufficient opportunity to opt out of disclosure to non-affiliates (or any other party, for that matter). This is because, as described above, while the Privacy Policies state that Customers may "limit this

sharing," as described above, the Third Party trackers will still instantaneously send data from Customers that visit Suncoast's Website even if a Customer calls the provided toll-free number and specifically requests that Suncoast stop or otherwise limit the sharing of their Personal and Financial Information (i.e., after the Customer has 'opted out'). The trackers are active on Suncoast's Website indiscriminately, regardless of what an individual Customer requests. Any opt-out request a Customer makes is thus entirely ineffective against Third Party trackers.

120.    Moreover, because Suncoast fails to disclose the extent of its data sharing practices, Customers like Plaintiff and Class Members are unable to make an informed decision as to whether to limit Suncoast's information sharing.

**E. Suncoast Violated the GLBA, FTC Standards, and Related Regulations**

121.    As a financial institution, Suncoast is subject to the GLBA. 15 U.S.C. § 6809(3)(A) (a "financial institution" is "any institution the business of which is engaging in financial activities...").

122.    Pursuant to the GLBA, "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

123.    The FTC has interpreted Section 5 of the FTC Act, 15 U.S.C. § 45, to include compliance with the GLBA Privacy Rule, 16 C.F.R. § 313.1 *et seq*. The FTC

consistently enforces the GLBA Privacy Rule, as failure to comply with the GLBA Privacy Rule is an unfair act or practice prohibited by Section 5 of the FTC Act.[63]

124.   The GLBA Privacy Rule is a regulation that "governs the treatment of nonpublic personal information about consumers by the financial institutions." 16 C.F.R. § 313.1 *et seq.*

125.   Pursuant to the GLBA Privacy Rule, "[a] financial institution must provide a notice of its privacy policies and practices with respect to both affiliated and nonaffiliated third parties, and allow the consumer to opt out of the disclosure of the consumer's nonpublic personal information to a nonaffiliated third party if the disclosure is outside of the exceptions."[64] Suncoast consistently fails to do this.

126.   The GLBA Privacy Rule defines sensitive information that should not be indiscriminately disclosed:

(n)   (1) Nonpublic personal information means:
        (i) Personally identifiable financial information; and
        (ii) Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available....
    (3) Examples of lists—

---

[63]   *See How to Comply with the Privacy Rule*, https://www.ftc.gov/business-guidance/resources/how-comply-privacy-consumer-financial-information-rule-gramm-leach-bliley-act (last visited Aug. 22, 2024) ("The FTC may bring enforcement actions for violations of the Privacy Rule.").

[64]   *See* FTC, *Financial Privacy Rule*, https://www.ftc.gov/legal-library/browse/rules/financial-privacy-rule (last visited August 8, 2024).

(i) Nonpublic personal information includes any list of individuals' names and street addresses that is derived in whole or in part using personally identifiable financial information (that is not publicly available), such as account numbers.…

(o)    (1) Personally identifiable financial information means any information:

(i) A consumer provides to you to obtain a financial product or service from you;

(ii) About a consumer resulting from any transaction involving a financial product or service between you and a consumer; or

(iii) You otherwise obtain about a consumer in connection with providing a financial product or service to that consumer.

(2) Examples—

(i) Information included. Personally identifiable financial information:

(A) Information a consumer provides to you on an application to obtain a loan, credit card, or other financial product or service;

(B) Account balance information, payment history, overdraft history, and credit or debit card purchase information;

(C) The fact that an individual is or has been one of your customers or has obtained a financial product or service from you;

(D) Any information about your consumer if it is disclosed in a manner that indicates that the individual is or has been your consumer;

(E) Any information that a consumer provides to you or that you or your agent otherwise obtain in connection with collecting on, or servicing, a credit account;

(F) Any information you collect through an Internet "cookie" (an information collecting device from a web server); and

(G) Information from a consumer report.

16 C.F.R. § 313.3

127.   The information that Suncoast disclosed to Third Parties via trackers—including *e.g.*, information when users apply for a Suncoast membership, informing third parties about users' progression through the applications, and specific details including personally identifiable information that users provide to Suncoast as part of the application processes—is "nonpublic personal information" under the GLBA and related regulations. 16 C.F.R. § 313.3.

128.   Suncoast has utterly failed to meet its privacy obligations under the GLBA: it has explicitly disclosed Customers' nonpublic personal information and Personal and Financial Information to Third Parties for marketing and advertising, including for Third Party and fourth party advertising use, and refused to allow customers to meaningfully limit this sharing.

129.   Suncoast fails to meet its notice obligations under the GLBA. "[A] financial institution may not, directly or through any affiliate, disclose to a nonaffiliated third party any nonpublic personal information, unless such financial institution provides or has provided to the consumer a notice that complies with section 6803 of this title." 15 U.S.C.A. § 6802. As outlined above, Suncoast's Privacy Policies fail to put Customers on notice as required here and actually promise that Customers' Personal and Financial Information will not be shared with Third Parties (and fourth parties) for targeted advertising purposes.

130.   For example, by stating in its Privacy Policies that Suncoast will not disclose Customers' Personal and Financial Information to Third Parties for their use in their own advertising and marketing, the Privacy Policies fail to properly disclose:

(1) the policies and practices of the institution with respect to disclosing nonpublic personal information to nonaffiliated third parties . . . including []the categories of persons to whom the information is or may be disclosed, other than the persons to whom the information may be provided [and] the policies and practices of the institution with respect to disclosing of nonpublic personal information of persons who have ceased to be customers of the financial institution . . .

(2) the categories of nonpublic personal information that are collected by the financial institution; [and]

(3) the policies that the institution maintains to protect the confidentiality and security of nonpublic personal information

15. U.S.C.A. § 6803.

131.   As detailed above, Suncoast also fails to meet its opt out obligations under the GLBA. The GLBA Privacy Rule requires financial institutions to, for example, "provide an opt out notice" to Customers, which notice "must state…[t]hat the consumer has the right to opt out of that disclosure [and] [a] reasonable means by which the consumer may exercise the opt out right." 16 C.F.R. § 313.7. Under the GLBA, Suncoast

may not disclose nonpublic personal information to a nonaffiliated third party unless—
(A)    [it] clearly and conspicuously discloses to the consumer. . . that such information may be disclosed to such third party;

(B)    ***the consumer is given the opportunity***, before the time that such information is initially disclosed, ***to direct that such information not be disclosed to such third party***; and

(C)    the consumer is given an explanation of how the consumer can exercise that nondisclosure option.

15 U.S.C.A. § 6802 (emphasis added).

132.    Suncoast fails to meet its opt out obligations because Customers are not provided an opportunity before disclosure to direct the nondisclosure of their information—as described above, Suncoast instantaneously discloses information when Customers visit its Website.

133.    Suncoast further fails to meet its opt out obligations because it does not provide Customers with an explanation of how they can exercise a nondisclosure option.

134.    Suncoast still further fails to meet its opt out obligations because it fails to provide Customers with reasonable means of opting out. The GLBA Privacy Rule provides "examples of reasonable opportunity to opt out":

(i) By mail. You mail the notices required in paragraph (a)(1) of this section to the consumer and allow the consumer to opt out by mailing a form, calling a toll-free telephone number, or any other reasonable means within 30 days from the date you mailed the notices.
(ii) By electronic means. A customer opens an on-line account with you and agrees to receive the notices required in paragraph (a)(1) of this section electronically, and you allow the customer to opt out by any reasonable means within 30 days after the date that the customer acknowledges receipt of the notices in conjunction with opening the account.

(iii) Isolated transaction with consumer. For an isolated transaction, such as the purchase of a money order by a consumer, you provide the consumer with a reasonable opportunity to opt out if you provide the notices required in paragraph (a)(1) of this section at the time of the transaction and request that the consumer decide, as a necessary part of the transaction, whether to opt out before completing the transaction.

16 C.F.R. § 313.10.

135.    Suncoast's only opt out procedure provides Customers with no real way to "opt-out"; and were a Customer to attempt to opt out, Suncoast fails to comply with its opt out obligations because it fails to fully abide by its Customers' opt out. Calling the toll-free number or visiting Suncoast's website does not actually opt a Customer out of sharing their information. This is not a "reasonable" means of opting out as outlined in the GLBA Privacy Rule. And anyway, Third Party trackers will continue to instantaneously send data from Customers visiting Suncoast's Website. Customers have **no** option to fully opt out of Disclosures to Third Parties or targeted advertising. This both fails to provide Customers with actual opportunity to opt out, and fails to abide by the opt out request, since Third Party trackers will continue to instantaneously send data from Customers visiting Suncoast's Website. Customers have **no** option to fully opt out.

136.  By perpetually disclosing its customers' Personal and Financial Information to third parties without consent, Suncoast failed and continues to fail to meet its obligations under the GLBA, FTC standards, and related regulations, to

establish appropriate standards and safeguards relative to Customers' Personal and Financial Information.

### F. Plaintiff's Experiences

137.   Plaintiff Eliorminia Casanova has been a member with Suncoast since approximately April 2024.

138.   Plaintiff Casanova has used Defendant's Website and online banking portal to facilitate her financial services with Defendant and input Personal and Financial Information into Defendant's Website at Defendant's direction and encouragement.

139.   Plaintiff Casanova is a Facebook user.

140.   Plaintiff Casanova applied for Defendant's services when she applied for membership online, and applied for a checking account, a savings account, and a Suncoast visa debit card. Plaintiff for a debit card from Defendant in approximately April 2024.

141.   Shortly after Plaintiff Casanova used Defendant's Website to apply for a debit card, she received advertising on Facebook, including for chime advertisements and other banks.

142.   At no point did Customers like Plaintiff sign any written authorization permitting Defendant to send their Personal and Financial Information to Third

Parties (or fourth parties) uninvolved in providing them with Defendant's financial services.

143.   Plaintiff reasonably expected that her communications with Suncoast were confidential, solely between Plaintiff and Suncoast, and that, as such, those communications and any Personal and Financial Information submitted would not be transmitted to or intercepted by a third party (or used by a fourth party).

144.   Plaintiff provided her Personal and Financial Information to Defendant and trusted that the information would be safeguarded according to Suncoast's promises and the law.

145.   Plaintiff never intended to sell her Personal and Financial Information, nor would she have permitted it to be made available for sale on the resale market.

146.   Plaintiff never intended to let Suncoast benefit from her Personal and Financial Information.

147.   Through the systematic data sharing process described in this complaint, Plaintiff's interactions with Suncoast's Website were disclosed to third parties, including Facebook. Plaintiff did not consent to those disclosures.

148.   On information and belief, through its use of Third Party trackers on its Website, Defendant disclosed to Third Parties information Plaintiff provided to Suncoast as a financial institution and resulting from a transaction for Plaintiff to

obtain Defendant's credit card, as well as information collected via Plaintiff's use of Suncoast's online banking portal, including Plaintiff's:

    a.    Membership application information;

    b.    Existing membership, or Customer, status;

    c.    Employment status;

    d.    Location of residency;

    e.    Duration of residency at her current address;

    f.    State that issued her identification;

    g.    Type of membership she applied for;

    h.    Address information including city and zip code;

    i.    Details related to membership eligibility;

    j.    Citizenship status;

    k.    IP address;

    l.    Browser fingerprint; and

    m.    Individual user cookies.

149. By failing to receive the requisite consent, Suncoast breached confidentiality and unlawfully disclosed Plaintiff's Personal and Financial Information.

150. Plaintiff would not have submitted her information to Suncoast if she had known it would be shared with Third Parties and fourth parties.

151. As a result of Suncoast's Disclosure of Plaintiff's Personal and Financial Information via the Facebook Pixel and other tracking technologies to Third Parties (and fourth parties) without authorization, Plaintiff suffered the following injuries:

a.  Loss of privacy; unauthorized disclosure of her Personal and Financial Information; unauthorized access of her Personal and Financial Information by Third Parties;

b.  Suncoast benefited from the use of Plaintiff's Personal and Financial Information without sharing that benefit with Plaintiff;

c.  Plaintiff now receives targeted advertisements from Third and Fourth Parties on social media, reflecting her Personal and Financial Information that was improperly disclosed and used;

d.  Plaintiff paid Suncoast for financial services, and the services she paid for included reasonable privacy and data security protections for her Personal and Financial Information, but due to Defendant's Disclosure, Plaintiff did not receive the privacy and security protections for which she paid;

e.  The portion of Suncoast's revenues and profits attributable to collecting Plaintiff's Personal and Financial Information without authorization and sharing it with Third Parties (and fourth parties);

f.  The portion of Suncoast's savings in marketing costs attributable to collecting Plaintiff's Personal and Financial Information without authorization and sharing it with Third Parties (and fourth parties);

g.  The portion of Suncoast's revenues and profits attributable to serving and monetizing advertisements directed to Plaintiff as a result of collecting Plaintiff's Personal and Financial Information without authorization and sharing it with Third Parties (and fourth parties);

h.  Value to Plaintiff of surrendering her choice to keep her Personal and Financial Information private and allowing Suncoast to track her data;

i.  Embarrassment, humiliation, frustration, and emotional distress;

j.  Decreased value of Plaintiff's Personal and Financial Information;

k.  Lost benefit of the bargain;

l.  Increased risk of future harm resulting from future use and disclosure of her Personal and Financial Information; and

m.  Statutory damages.

## **TOLLING, CONCEALMENT, AND ESTOPPEL**

152.  The applicable statutes of limitation have been tolled as a result of Suncoast's knowing and active concealment and denial of the facts alleged herein.

153.  Suncoast seamlessly incorporated trackers into its Website while providing Customers using those platforms with no indication that their Website

usage was being tracked and transmitted to Third Parties. Suncoast knew that its Website incorporated trackers, yet it failed to disclose to Plaintiff and Class Members that their sensitive Personal and Financial Information would be intercepted, collected, used by, and disclosed to Third Parties.

154.   Plaintiff and Class Members could not with due diligence have discovered the full scope of Suncoast's conduct, because there were no disclosures or other indication that they were interacting with websites employing tracking technology to unauthorizedly disclose their Personal and Financial Information.

155.   All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Suncoast's illegal interception and disclosure of Plaintiff's and the Class's Personal and Financial Information has continued unabated. What is more, Suncoast was under a duty to disclose the nature and significance of its data collection practices but did not do so. Suncoast is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

156.   Plaintiff brings this nationwide class action on behalf of herself and on behalf of all other similarly situated persons pursuant to Fed. R. Civ. P. 23.

157.   Plaintiff seeks to represent the following classes:

**Nationwide Class**: All individuals in the United States whose Personal and Financial Information was disclosed by Defendant to Third Parties through Defendant's Website's tracking technology without authorization.

**Florida Subclass**: All individuals in Florida whose Personal and Financial Information was disclosed by Defendant to Third Parties through Defendant's Website's tracking technology without authorization.

158. Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

159. Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

160. This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23(a)(1)-(4).

161. <u>Numerosity</u>: Class Members are so numerous and geographically dispersed that joinder of all members is impracticable. Upon information and belief, there likely millions of individuals throughout the United States whose Personal and Financial Information has been improperly used or disclosed by Defendant, and the Classes are identifiable within Defendant's records.

162. <u>Ascertainability</u>. Class Members are readily identifiable from information in Defendant's possession, custody, and control.

163.   <u>Commonality and Predominance</u>: Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a.   Whether Defendant disclosed Class Members' Personal and Financial Information to Third Parties;

b.   Whether Class Members consented to Defendant's disclosure of their Personal and Financial Information;

c.   Whether Defendant owed duties to Plaintiff and Class Members to protect their Personal and Financial Information;

d.   Whether Defendant breached its duty to protect Plaintiff's and Class Members' Personal and Financial Information;

e.   Whether Defendant's disclosure of Plaintiff's and Class Members' Personal and Financial Information to Third Parties violated federal, state and local laws, or industry standards;

f.   Whether Defendant's failure to allow Customers a meaningful opportunity to opt out of sharing with Third Parties violated federal, state and local laws, or industry standards;

g.   Whether Defendant's conduct resulted in or was the actual cause of the disclosure of Plaintiff's and Class Members' and Personal and Financial Information;

h.   Whether Defendant's conduct resulted in or was the proximate cause of the disclosure of Plaintiff's and Class Members' Personal and Financial Information;

i.   Whether Defendant has a contractual obligation to protect Plaintiff's and Class Members' Personal and Financial Information and whether it complied with such contractual obligation;

j.   Whether Defendant has a statutory and/or common law duty to protect Plaintiff's and Class Members' Personal and Financial Information and whether it complied with such obligation;

k. Whether Defendant's conduct amounted to violations of state consumer protection statutes;

l. Whether Defendant's conduct amounted to violations of state and federal wiretap statutes;

m. Whether Defendant's conduct amounted to violations of other Florida state laws;

n. Whether Defendant should retain Plaintiff's and Class Members' valuable Personal and Financial Information; and

o. Whether, as a result of Defendant's conduct, Plaintiff and Class Members are entitled to injunctive, equitable, declaratory and/or other relief, and, if so, the nature of such relief.

164.    Defendant has engaged in a common course of conduct toward Plaintiff and the Class Members, in that the Plaintiff's and Class Members' data was stored on the same computer system and unlawfully disclosed and accessed in the same way. As set forth above, the common issues arising from Defendant's conduct affecting Class Members predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

165.    Typicality: Plaintiff's claims are typical of those of other Class Members because all had their Personal and Financial Information compromised as a result of Defendant's use and incorporation of Facebook Pixel and other tracking technology.

166.    Policies Generally Applicable to the Classes: This class action is also appropriate for certification because Defendant has acted or refused to act on

grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiff.

167. <u>Adequacy</u>: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiff has suffered is typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

168. <u>Superiority and Manageability</u>: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense

that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

169.   The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged. If the class action device were not used, Defendant would necessarily gain an unconscionable advantage because it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

170.   The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable

identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

171.   Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

172.   Unless a Class-wide injunction is issued, Defendant may continue in its unlawful use and disclosure and failure to properly secure the Personal and Financial Information of Plaintiff and the Class Members, Defendant may continue to refuse to provide proper notification to and obtain proper consent from Class Member, and Defendant may continue to act unlawfully as set forth in this Complaint.

173.   Moreover, Defendant has acted or refused to act on grounds generally applicable to the Classes, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Classes is appropriate.

174.   Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

   a. Whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Personal and Financial Information;

   b. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Personal and Financial Information;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of customer information;

d. Whether Defendant was negligent and/or negligent *per se*;

e. Whether an implied contract existed between Defendant on the one hand, and Plaintiff and Class Members on the other, and the terms of that contract;

f. Whether Defendant breached the contract;

g. In the alternate, whether Defendant was unjustly enriched;

h. Whether a bailment existed between Defendant on the one hand, and Plaintiff and Class Members on the other;

i. Whether Defendant breached its bailment duty;

j. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Personal and Financial Information had been used and disclosed to Third Parties and used for Third Party and fourth party benefit;

k. Whether Defendant adequately provided opt-out measures;

l. Whether Defendant abided by Plaintiff's and Class Members' opt-out requests;

m. Whether Defendant failed to implement and maintain reasonable security procedures and practices;

n. Whether Defendant invaded Plaintiff and the Class Members' privacy;

o. Whether Defendant breached its implied duty of confidentiality; and,

p. Whether Plaintiff and the Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## COUNT I
## NEGLIGENCE
## (On Behalf of Plaintiff and the Classes)

175. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

176. Plaintiff and Class Members submitted sensitive nonpublic personal information, including Personal and Financial Information, when accessing Suncoast's Website.

177. Defendant owed to Plaintiff and Class Members a duty to exercise reasonable care in handling and using Plaintiff's and Class Members' Personal and Financial Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from the disclosure and unauthorized transmittal and use of Personal and Financial Information that occurred.

178. Defendant's duties to keep the nonpublic personal information, including Personal and Financial Information, confidential also arose under the GLBA, which imposes "an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

179. Defendant's duties to keep the nonpublic personal information, including Personal and Financial Information, confidential also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits

"unfair . . . practices in or affecting commerce," including the unfair practice of failing to keep the nonpublic personal information confidential.

180.   Defendant acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiff's and Class Members' Personal and Financial Information by disclosing and providing access to this information to the Third Parties for the financial benefit of the Third Parties (and fourth parties) and Defendant.

181.   Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's disclosure of their Personal and Financial Information to benefit Third Parties (and fourth parties) and Defendant. Defendant actively sought and obtained Plaintiff's and Class Members' Personal and Financial Information. And Defendant knew or should have known that by integrating tracking technology on its Website that Plaintiff's and Class Members' nonpublic personal information, including Personal and Financial Information, would be disclosed to the Third Parties (and used by the fourth parties).

182.   Personal and Financial Information is highly valuable, and Defendant knew, or should have known, the harm that would be inflicted on Plaintiff and Class Members by disclosing their Personal and Financial Information to the Third Parties.

This disclosure was of benefit to the Third Parties (and fourth parties) and Defendant by way of data harvesting, advertising, and increased sales.

183.   Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers in the handling and securing of Personal and Financial Information of Plaintiff and Class Members. This failure actually and proximately caused Plaintiff's and Class Members' injuries.

184.   As a direct, proximate, and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or imminently will suffer injury and damages, including monetary damages, inappropriate advertisements and use of their Personal and Financial Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

185.   Defendant's breach of its common-law duties to exercise reasonable care and negligence, directly and proximately caused Plaintiff's and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation: the unauthorized access of their Personal and Financial Information by Third Parties (and fourth parties); improper disclosure of their Personal and Financial Information; receipt of targeted advertisements reflecting private financial information; lost benefit of their bargain; lost value of their Personal and Financial Information and diminution in value; embarrassment, humiliation, frustration, and emotional distress;

lost time and money incurred to mitigate and remediate the effects of use of their information, as to targeted advertisements that resulted from and were caused by Defendant's negligence; value to Plaintiff and the Class Members of surrendering their choices to keep their Personal and Financial Information private and allowing Defendant to track their data; increased risk of future harm resulting from future use and disclosure of Plaintiff's and the Class Members' Personal and Financial Information; and other injuries and damages as set forth herein. These injuries are ongoing, imminent, immediate, and continuing.

186.  Defendant's negligence directly and proximately caused the unauthorized access and Disclosure of Plaintiff's and Class Members' Personal and Financial Information, and as a result, Plaintiff and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiff and Class Members seek actual and compensatory damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence.

187.  Plaintiff and Class Members seek to recover the value of the unauthorized access to their Personal and Financial Information resulting from Defendant's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's

ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use value of the intellectual property—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such intellectual property to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and Class Members have a protectible property interest in their Personal and Financial Information; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions

188.   Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Classes)**

189.   Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

190.   Plaintiff brings this negligence *per se* count not as a standalone cause of action but as a legal doctrine to establish the breach element of the common law negligence claim.

191.   Pursuant to the laws set forth herein, including the FTC Act, the GLBA, and state law, Defendant was required by law and industry standards to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiff's and Class Members' Personal and Financial Information.

192.   Plaintiff and Class Members are within the class of persons that these statutes and rules were designed to protect.

193.   Defendant had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' Personal and Financial Information.

194.   Defendant owed a duty to timely and adequately inform Plaintiff and Class Members, in the event of their Personal and Financial Information being improperly disclosed to unauthorized Third Parties.

195.   It was not only reasonably foreseeable, but it was intended, that the failure to reasonably protect and secure Plaintiff's and Class Members' Personal and Financial Information in compliance with applicable laws would result in

unauthorized Third Parties and fourth parties gaining access to Plaintiff's and Class Members' Personal and Financial Information, and resulting in Defendant's liability under principles of negligence *per se*.

196.    Defendant violated its duty under Section 5 of the FTC Act, the GLBA, and/or state law by failing to use reasonable measures to protect Plaintiff's and Class Members' Personal and Financial Information and not complying with applicable industry standards as described in detail herein.

197.    Plaintiff's and Class Member's Personal and Financial Information constitutes personal property that was taken and misused as a proximate result of Defendant's negligence, resulting in harm, injury and damages to Plaintiff and Class Members.

198.    As a proximate result of Defendant's negligence *per se* and breach of duties as set forth above, Plaintiff and Class Members were caused to, *inter alia*, have their data shared with Third Parties and fourth parties without their authorization or consent, receive unwanted advertisements that reveal seeking financial advice for specific issues, fear, anxiety and worry about the status of their Personal and Financial Information, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their Personal and Financial Information, all of which can constitute actionable actual damages.

199.   Defendant's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' Personal and Financial Information, and as a result, Plaintiff and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiff and Class Members seek actual, and compensatory damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence *per se*.

200.   Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

## COUNT III
## INVASION OF PRIVACY—INTRUSION UPON SECLUSION
### (On Behalf of Plaintiff and the Classes)

201.   Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

202.   Florida recognizes the tort of invasion of privacy – intrusion upon seclusion.

203.   "Intrusion upon seclusion is defined as where a person 'intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or her

private affairs or concerns … if the intrusion would be highly offensive to a reasonable person." *Jackman v. Cebrink-Swartz*, 334 So. 3d 653, 656 (Fla. 2d DCA 2021).

204.  Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website.

205.  While using Defendant's Website, Plaintiff and Class Members communicated sensitive Personal and Financial Information that they intended for only Defendant to receive and that they understood Defendant would keep private. Plaintiff's and Class Members' Personal and Financial Information is extremely private and not a matter of legitimate public interest.

206.  As set forth above, Defendant disclosed Plaintiff's and the Class Members' Personal and Financial Information and confidential communications to Facebook and other third parties, without their authorization or knowledge.

207.  Defendant's disclosure of the substance and nature of those communications to Third Parties without the knowledge and consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion in their private affairs and concerns.

208.  Plaintiff and Class Members had a reasonable expectation of privacy in their communications over the Website. This expectation is further reinforced given their relationship with Defendant as a financial institution. Furthermore, Defendant's

Privacy Policies enforced this reasonable expectation. Moreover, Plaintiff and Class Members have a general expectation that their communications regarding Personal and Financial Information with their financial institution will be kept confidential.

209.   Plaintiff and Class Members reasonably expected that their private communications with the Website would not be tracked, surveilled, recorded, eavesdropped, or otherwise intruded upon, and that their confidential communications with their financial institution would remain private.

210.   Defendant intentionally intruded upon Plaintiff and Class Members' privacy by secretly recording their usage of the Website, including the Personal and Financial Information and confidential communications included therein.

211.   Defendant's disclosure of Personal and Financial Information is highly offensive to the reasonable person.

212.   As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights, and other injuries and damages as set forth in the preceding paragraphs.

213.   Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

214.   Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to, damages that will reasonably compensate Plaintiff and

Class Members for the harm to their privacy interests as a result of its intrusions upon Plaintiff's and Class Members' privacy.

215.   Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

216.   Plaintiff also seeks such other relief as the Court may deem just and proper.

**COUNT IV**
**INVASION OF PRIVACY – DISCLOSURE OF PRIVATE FACTS**
**(On Behalf of Plaintiff and the Florida Subclass)**

217.   Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

218.   Florida also recognizes the tort of invasion of privacy – disclosure of private facts.

219.   "The tort of disclosure of private facts ort of invasion of privacy by public disclosure of private facts" is defined as where "[o]ne who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly

offensive to a reasonable person, and (b) is not a legitimate concern to the public."

*Cape Publications, Inc. v. Hitchner*, 549 So. 2d 1374, 1377 (Fla. 1989).

220.   Plaintiff and Class Members' Personal and Financial Information is extremely private and not a matter of legitimate public interest.

221.   The unauthorized disclosure of Personal and Financial Information by a financial institution, such as Defendant, is highly offensive to a reasonable person.

222.   Defendant intentionally configured and installed tracking technologies on its Website, which it then used to record Plaintiff and Class Members' Personal and Financial Information and disclose that Personal and Financial Information to Third Parties.

223.   By sharing Plaintiff and Class Members' Personal and Financial Information with Third Parties, Defendant gave publicity to the private lives of Plaintiff and Class Members.

224.   Defendant acted with a knowing state of mind when it used source code tools specifically designed to track and record Customers' Personal and Financial Information and disclose that Personal and Financial Information to third parties.

225.   As a proximate result of Defendant's acts and omissions, Plaintiff's and Class Members' Personal and Financial Information was disclosed to Third Parties—and is now available for further disclosure and redisclosure without authorization, further inflicting injuries on Plaintiffs and the Class.

226. As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

227. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

228. Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to, damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of Defendant's unlawful disclosure.

229. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

230. Plaintiff also seeks such other relief as the Court may deem just and proper.

**COUNT V**
**BREACH OF EXPRESS CONTRACT**
**(On Behalf of Plaintiff and the Classes)**

231.   Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

232.   Plaintiff and Class Members also entered into an express contract with Suncoast when they obtained financial services from Suncoast, or otherwise provided nonpublic personal information, including Personal and Financial Information, to Suncoast.

233.   As part of these transactions, Suncoast explicitly agreed to safeguard and protect Plaintiff's and Class Members' Personal and Financial Information.

234.   Plaintiff and Class Members entered into express contracts with the reasonable expectation (based on Suncoast's own express promises) that Suncoast would keep their nonpublic personal information, including Personal and Financial Information, confidential. Plaintiff and Class Members believed that Suncoast would use part of the monies paid to Suncoast under the express contracts to keep their nonpublic personal information, including Personal and Financial Information, confidential.

235.   Plaintiff and Class Members would not have provided and entrusted their nonpublic personal information, including Personal and Financial Information, would not have used Suncoast's services, and/or would have paid less for Suncoast's services in the absence of the express contract terms between them and Suncoast.

236.   As detailed above, Suncoast breached its express contracts with Plaintiff and Class Members to protect their nonpublic personal information, including Personal and Financial Information, when it disclosed that information to Third Parties.

237.   As a direct and proximate result of Suncoast's breach of express contract, Plaintiff and Class Members sustained actual losses and damages as described in detail above.

**COUNT VI**
**BREACH OF IMPLIED CONTRACT**
**(IN THE ALTERNATIVE TO EXPRESS CONTRACT CLAIM)**
**(On Behalf of Plaintiff and the Classes)**

238.   Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

239.   Plaintiff pleads this claim separately as well as in the alternative to her claim for breach of express contract and only if the parties' express contract is deemed unconscionable or otherwise unenforceable for any reason. Plaintiff makes the following allegations in this count only hypothetically and as an alternative to any contrary allegations in her other causes of action, in the event that such causes of action do not succeed.

240.   Plaintiff and Class Members were required to provide their Personal and Financial Information to Suncoast as a condition of their application and/or receipt of financial services.

241.   Plaintiff and Class Members also entered into an implied contract with Suncoast when they obtained financial services from Suncoast, or otherwise provided nonpublic personal information, including Personal and Financial Information, to Suncoast.

242.   Implicit in the agreement between Suncoast and Plaintiff and the Class was the obligation that both parties would maintain the confidentiality and security of Plaintiff's and Class Members' Personal and Financial Information.

243.   Plaintiff and Class Members, through their course of conduct, mutually agreed and entered into implied contracts with the reasonable expectation (based on Suncoast's own express and implied policy representations) that Suncoast would keep their nonpublic personal information, including Personal and Financial Information, confidential. Plaintiff and Class Members believed that Suncoast would use part of the monies paid to Suncoast under the implied contracts to keep their nonpublic personal information, including Personal and Financial Information, confidential.

244.   Suncoast had an implied duty of good faith to ensure that the Personal and Financial Information of Plaintiff and Class Members in its possession was only used and shared only as authorized, such as the application for or provision of financial services.

245.   Plaintiff and Class Members would not have provided and entrusted their nonpublic personal information, including Personal and Financial Information, would not have used Suncoast's financial services, and/or would have paid less for Suncoast's services in the absence of the implied contract and implied terms between them and Suncoast. The safeguarding of the nonpublic personal information, including Personal and Financial Information, of Plaintiff and Class Members was critical to realize the intent of the parties.

246.   Suncoast had an implied duty to reasonably safeguard and protect the Personal and Financial Information of Plaintiff and Class members from unauthorized disclosure or uses.

247.   Additionally, Suncoast implicitly promised to retain this Personal and Financial Information only under conditions that kept such information secure and confidential.

248.   As detailed above, Suncoast breached its implied contracts with Plaintiff and Class Members to protect their nonpublic personal information, including Personal and Financial Information, when it disclosed that information to Third Parties.

249.   Suncoast's acts and omissions have materially affected the intended purpose of the implied contacts requiring Plaintiff and Class members to provide their Personal and Financial Information in exchange for financial services.

250.   As a direct and proximate result of Suncoast's breach of implied contract, Plaintiff and Class Members sustained actual losses and damages as described in detail above.

## COUNT VII
## UNJUST ENRICHMENT (IN THE ALTERNATIVE TO CONTRACT CLAIMS)
### (On Behalf of Plaintiff and the Classes)

251.   Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

252.   Plaintiff and Class Members have an equitable, legal, and financial interest in their Personal and Financial Information that was conferred upon, collected by, and maintained by Defendant and that was ultimately disclosed without their consent.

253.   Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of valuable, sensitive, personal, and financial information—Personal and Financial Information—that Defendant collected from Plaintiff and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, for marketing purposes, and for sale or trade with Third Parties. Defendant did not share this benefit with Plaintiff and Class Members.

254.   Plaintiff and Class Members would not have used Defendant's services, or would have paid less for those services, if they had known that Defendant would

collect, use, and disclose their Personal and Financial Information to Third Parties or allow Third Parties (and fourth parties) to use their Personal and Financial Information.

255.   Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class Members.

256.   The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members themselves. Under unjust enrichment principles, it would be inequitable for Defendant to retain the profit and/or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

257.   Defendant continues to benefit and profit from its retention and use of Plaintiff's and Class Members' Personal and Financial Information, while its value to Plaintiff and Class Members has been diminished.

258.   Plaintiff pleads this claim separately as well as in the alternative to claims for damages under Fed. R. Civ. P. 8(a)(3), because if the Court dismisses Plaintiff's claims for damages or enters judgment on them in favor of the Defendant, Plaintiff's will have no adequate legal remedy. Plaintiff makes the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in her other causes of action, in the event that such causes of action do not succeed. Plaintiff and the Class Members may be unable to obtain monetary,

declaratory, and/or injunctive relief directly under other causes of action, and, if so, will lack an adequate remedy at law.

259.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds it received as a result of the conduct and the unauthorized Disclosure alleged herein.

## COUNT VIII
## VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (On Behalf of Plaintiff and the Florida Subclass)

260.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

261.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  § 501.202(2), Fla. Stat. Ann.

262.    "A deceptive practice is one that is 'likely to mislead' consumers. *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006).

263.    "An unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Id.* (cleaned up).

264.   Under the FDUTPA, violation of the act includes "any violation of this act or the rules adopted under this act and may be based upon any of the following as of July 1, 2017: (a) Any rules promulgated pursuant to the Federal Trade Commission Act, 15 U.S.C. ss. 41 et seq.; (b) The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts; or (c) Any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.…" § 501.203, Fla. Stat. Ann.

265.   Defendant committed unfair and deceptive acts, including but not limited to:

(1) Encouraging Customers to use Suncoast's Website while failing to disclose the material fact that it discloses Customers' Personal and Financial Information to Third Parties (and fourth parties), without authorization or permission. information relating to Plaintiff's and Class Members' financial services, without their knowledge, consent, or authorization, as part of a scheme, artifice, or device with the intent to mislead Customers.

(2) Encouraging Customers to use Suncoast's Website while omitting the material fact that it uses Customers' Personal and Financial Information, without their authorization for marketing purposes and to

increase its revenue.

(3) Marketing itself as a trusted financial services provider while failing to adhere to data privacy standards that govern financial services providers, including federal law and regulations, industry standards, and the fiduciary duties that apply to financial services providers.

(4) By installing and implementing trackers from Third Parties, Defendant knew or reasonably should have known it intercepted and transmitted Plaintiff's and Class Member's communications from Plaintiff's and Class Members' browsers directly to the Third Party creators of those trackers.

266. Suncoast's violations were willful and were done as part of a scheme, artifice, or device with intent to defraud or mislead, and therefore are incurable deceptive acts under the FDUTPA.

267. "[A]nyone aggrieved by a violation of [the FDUTPA] may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part." § 501.211(1), Fla. Stat. Ann.

268. "In any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs." § 501.211(2), Fla. Stat. Ann.

269.   Had Plaintiff and members of the Florida subclass been aware that their Personal and Financial Information would be transmitted to unauthorized third parties, they would not have entered into such transactions and would not have provided payment or confidential financial information to Defendant.

270.   As a direct and proximate result of Defendant's unfair and deceptive acts and practices in violation of the FDUTPA, Plaintiff and Class Members have suffered damages for which Defendant is liable.

271.   Plaintiff and Class Members seek actual damages plus interest on damages at the legal rate, as well as all other just and proper relief afforded by the FDUTPA. As redress for Defendant's repeated and ongoing violations, Plaintiff and Class Members are entitled to, *inter alia*, actual damages, attorneys' fees and costs, and injunctive relief.

## COUNT IX
## VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")
## 18 U.S.C. §§ 2511(1), *et seq.*
### (On Behalf of Plaintiff and the Classes)

272.   Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

273.   The ECPA protects both sending and receipt of communications. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or

electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

274. The transmissions of Plaintiff's and Class Members' Personal and Financial Information to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

275. **Electronic Communications**. The transmission of Personal and Financial Information between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

276. **Content**. The ECPA defines content, when used with respect to electronic communications, to "include [] any information concerning the substance, purport, or meaning of that communication." *See* 18 U.S.C. § 2510(8).

277. **Interception**. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include any information concerning the substance, purport, or meaning of that communication." See 18 U.S.C. § 2510(4), (8).

278.  **Electronic, Mechanical or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.  Plaintiff's and Class Members' browsers;

    b.  Plaintiff's and Class Members' computing devices;

    c.  Defendant's web-servers;

    d.  Defendant's Website; and

    e.  The tracking technology deployed by Defendant effectuated the sending and acquisition of customer communications.

279.  By utilizing and embedding the tracking technology on its Website, Defendant intentionally intercepted, endeavored to intercept and procured another person to intercept the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

280.  Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the tracking technology which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Personal and Financial Information to Third Parties.

281.   Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding Personal and Financial Information.

282.   By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to Third Parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

283.   By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

284.   **Unauthorized Purpose.** Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, among others.

285.   Defendant intentionally used wire or electronic communications to increase its profit margins and save on marketing costs.

286.    Defendant specifically used tracking technology to track and to utilize Plaintiff's and Class Members' Personal and Financial Information for financial gain.

287.    Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

288.    Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy via the tracking technology.

289.    In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of its Website, Defendant's purpose was tortious, criminal and designed to violate federal and state legal provisions, including as described above the following: (i) a knowing intrusion into a private, place, conversation or matter that would be highly offensive to a reasonable person; and (ii) violation of GLBA, the FTC Act, invading Plaintiff's and Class Members' privacy, and in breach of its fiduciary duty of confidentiality.

**COUNT X**
**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. § 2511(3)(a)**
**UNAUTHORIZED DIVULGENCE BY ELECTRONIC COMMUNICATIONS SERVICE**
**(On Behalf of Plaintiff and the Classes)**

290.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

291.   The ECPA provides that "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).

292.   **Electronic Communication Service**. An "electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Defendant's Website is an electronic communication service which provides to users thereof, customers of Defendant, the ability to send or receive electronic communications; in the absence of Defendant's Website, internet users could not send or receive communications regarding Plaintiff's and Class Members' Personal and Financial Information.

293.   **Intentional Divulgence**. Defendant intentionally designed the tracking technology and was or should have been aware that, if so configured, it could divulge Plaintiff's and Class Members' Personal and Financial Information. Upon information and belief, Defendant's divulgence of the contents of Plaintiff's and Class Members' communications was contemporaneous with their exchange with Defendant's Website, to which they directed their communications.

294.   Defendant divulged the contents of Plaintiff's and Class Members'
electronic communications without authorization and/or consent.

295.   **Exceptions do not apply**. In addition to the exception for
communications directly to an electronic communications service ("ECS")[65] or an
agent of an ECS, the ECPA states that

> A person or entity providing electronic communication service to the
> public may divulge the contents of any such communication—
>> (i) as otherwise authorized in section 2511(2)(a) or 2517 of this
>> title;
>> (ii) with the lawful consent of the originator or any addressee or
>> intended recipient of such communication;
>> (iii) to a person employed or authorized, or whose facilities are
>> used, to forward such communication to its destination; or
>> (iv) which were inadvertently obtained by the service provider
>> and which appear to pertain to the commission of a crime, if such
>> divulgence is made to a law enforcement agency.

U.S.C. § 2511(3)(b).

296.   Section 2511(2)(a)(i) provides:

> It shall not be unlawful under this chapter for an operator of a
> switchboard, or an officer, employee, or agent of a provider of wire or
> electronic communication service, whose facilities are used in the
> transmission of a wire or electronic communication, to intercept,
> disclose, or use that communication in the normal course of his
> employment while engaged in any activity which is a necessary
> incident to the rendition of his service or to the protection of the rights
> or property of the provider of that service, except that a provider of wire
> communication service to the public shall not utilize service observing

---

[65] An ECS is "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

or random monitoring except for mechanical or service quality control checks.

297.  Defendant's divulgence of the contents of Plaintiff's and Class Members' communications to Third Parties was not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither: (i) a necessary incident to the rendition of Defendant's service nor (ii) necessary to the protection of the rights or property of Defendant.

298.  Section 2517 of the ECPA relates to investigations by government officials and has no relevance here.

299.  Defendant's divulgence of the contents of Plaintiff's and the Class Members' communications on its Website through the tracking technology was not done "with the lawful consent of the originator or any addresses or intended recipient of such communication[s]." 18 U.S.C.A. § 2511(3)(b)(ii). As alleged above: (i) Plaintiff and Class Members did not authorize Defendant to divulge the contents of their communications and (ii) Defendant did not procure the "lawful consent" from the websites or apps with which Plaintiff and Class Members were exchanging information.

300.  Moreover, Defendant divulged the contents of Plaintiff's and Class Members' communications through tracking technology to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

301.   The contents of Plaintiff's and Class Members' communications did not appear to pertain to the commission of a crime and Defendant did not divulge the contents of their communications to a law enforcement agency.

302.   As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages, preliminary and other equitable or declaratory relief as may be appropriate, punitive damages in an amount to be determined by a jury and a reasonable attorney's fee and other litigation costs reasonably incurred.

**COUNT XI**
**VIOLATION OF TITLE II OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("STORED COMMUNICATIONS ACT")**
**18 U.S.C. § 2702, *et seq.***
**(On Behalf of Plaintiff and the Classes)**

303.   Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

304.   The ECPA further provides that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

305.   **Electronic Communication Service**. ECPA defines "electronic communications service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Defendant intentionally procures and embeds various Plaintiff's and Class Members'

Personal and Financial Information through the tracking technology used on
Defendant's Website, which qualifies as an Electronic Communication Service.

306. **Electronic Storage**. ECPA defines "electronic storage" as "any
temporary, intermediate storage of a wire or electronic communication incidental to
the electronic transmission thereof" and "any storage of such communication by an
electronic communication service for purposes of backup protection of such
communication." 18 U.S.C. § 2510(17).

307. Defendant stores the content of Plaintiff's and Class Members'
communications on Defendant's Website and files associated with it.

308. When Plaintiff or Class Members make a Website communication, the
content of that communication is immediately placed into storage.

309. Defendant knowingly divulges the contents of Plaintiff's and Class
Members' communications through the tracking technology.

310. **Exceptions Do Not Apply**. Section 2702(b) of the Stored
Communication Act provides that an electronic communication service provider

> may divulge the contents of a communication—
> (1) to an addressee or intended recipient of such communication or an
> agent of such addressee or intended recipient;
> (2) as otherwise authorized in Section 2517, 2511(2)(a), or 2703 of this
> title;
> (3) with the lawful consent of the originator or an addressee or intended
> recipient of such communication, or the subscriber in the case of remote
> computing service;
> (4) to a person employed or authorized or whose facilities are used to
> forward such communication to its destination;

(5) as may be necessarily incident to the rendition of the service or to the protection of the rights or property of the provider of that service;

(6) to the National Center for Missing and Exploited Children, in connection with a report submitted thereto under section 2258A;

(7) to a law enforcement agency—

    (A) if the contents—

    (i) were inadvertently obtained by the service provider; and

    (ii) appear to pertain to the commission of a crime; . . .

(8) to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of communications relating to the emergency; or

(9) to a foreign government pursuant to an order from a foreign government that is subject to an executive agreement that the Attorney General has determined and certified to Congress satisfies Section 2523.

311. Defendant did not divulge the contents of Plaintiff's and Class Members' communications to "addressees," "intended recipients," or "agents" of any such addressees or intended recipients of Plaintiff and Class Members.

312. Sections 2517 and 2703 of the ECPA relate to investigations by government officials and have no relevance here.

313. Section 2511(2)(a)(i) provides:

It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

314. Defendant's divulgence of the contents of Plaintiff's and Class Members' communications on its Website to Third Parties was not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither: (i) a necessary incident to the rendition of the Defendant's services nor (ii) necessary to the protection of the rights or property of Defendant.

315. Defendant's divulgence of the contents of Plaintiff's and Class Members' customer user communications on its Website was not done "with the lawful consent of the originator or any addresses or intended recipient of such communication[s]." 18 U.S.C.A. § 2511(3)(b)(ii). As alleged above: (i) Plaintiff and Class Members did not authorize Defendant to divulge the contents of their communications and (ii) Defendant did not procure the "lawful consent" from the websites or apps with which Plaintiff and Class Members were exchanging information.

316. Moreover, Defendant divulged the contents of Plaintiff's and Class Members' communications through the tracking technology to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

317. The contents of Plaintiff's and Class Members' communications did not appear to pertain to the commission of a crime and Defendant did not divulge the contents of their communications to a law enforcement agency.

318.   As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages, preliminary and other equitable or declaratory relief as may be appropriate, punitive damages in an amount to be determined by a jury and a reasonable attorney's fee and other litigation costs reasonably incurred.

**COUNT XII**
**VIOLATION OF THE FLORIDA WIRETAP ACT**
**§ 934.03, FLA. STAT. ANN.,** ***ET SEQ.***
**(On Behalf of Plaintiff and the Florida Subclass)**

319.   Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

320.   Under Florida's wiretap act, "[a]ny person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of ss. 934.03-934.09 shall have a civil cause of action against any person or entity who intercepts, discloses, or uses, or procures any other person or entity to intercept, disclose, or use, such communications and shall be entitled to recover from any such person or entity." § 934.10, Fla. Stat. Ann.

321.   It is a violation of the Florida Wiretap Act for any person "to Intentionally intercept[], endeavor[] to intercept, or procure[] any other person to intercept or endeavor to intercept any wire, oral, or electronic communication." § 934.03, Fla. Stat. Ann.

322.   Florida is an 'all-party' state, meaning "**all of the parties** to the communication [must] have given prior consent to such interception" to make such interception legal. § 934.03, Fla. Stat. Ann. (emphasis added).

323.   As explained above, Defendant's divulgence of the contents of Plaintiff's and the Class Members' communications on its Website through the tracking technology was not done with the lawful consent of either sender or receiver.

324.   Defendant intentionally recorded and/or acquired Plaintiff's and Class Members' private electronic communications, without the consent of Plaintiff and Class Members, using the Pixel and similar tracking technologies on its Online Platforms.

325.   Defendant intentionally recorded and/or acquired Plaintiff's and Class Members' private electronic communications for the purpose of disclosing those communications to Third Parties without the knowledge, consent, or written authorization of Plaintiff or Class Members.

326.   Plaintiff's and Class Members' communications with Defendant constitute private conversations, communications, and information.

327.   Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Online Platforms.

328.    Plaintiff and Class Members communicated sensitive Personal and Financial Information that they intended for only Defendant to receive and that they understood Defendant would keep private.

329.    Plaintiff and Class Members have a reasonable expectation that Defendant would not disclose Personal and Financial Information and confidential communications to third parties without Plaintiff's or Class Members' authorization, consent, or knowledge.

330.    Plaintiff and Class Members had a reasonable expectation of privacy given Defendant's representations, Privacy Policies, and the GLBA. Moreover, Plaintiff and Class Members have a general expectation that their communications with their financial institution will be kept confidential.

331.    Plaintiff and Class Members were unaware that their Personal and Financial Information was being surreptitiously recorded and transmitted to third parties as they communicated with Defendant through its Online Platforms.

332.    Without Plaintiff's or Class Members' knowledge, authorization, or consent, Defendant used the tracking technologies embedded and concealed into the source code of its Website to secretly record and transmit Plaintiff's and Class Members' private communications to hidden Third Parties as described in the preceding paragraphs.

333.    Under the Florida Wiretap Act:

(1) Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of ss. 934.03-934.09 shall have a civil cause of action … and shall be entitled to recover…

   (a) Preliminary or equitable or declaratory relief as may be appropriate;

   (b) Actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;

   (c) Punitive damages; and

   (d) A reasonable attorney's fee and other litigation costs reasonably incurred.

§ 934.10, Fla. Stat. Ann.

334. The eavesdropping devices used in this case include, but are not limited to:

   a. Plaintiff's and Class Members' personal computing devices;

   b. Plaintiff's and Class Members' web browsers;

   c. Plaintiff's and Class Members' browser-managed files;

   d. Facebook's Pixel;

   e. Internet cookies;

   f. Other tracking technology including Meta, Facebook Events, Google, Google Analytics, DoubleClick Ads, SiteImprove, AdTheorent, Nextdoor, AdsWizz, TikTok, Sitecore, AlphaRank, BlueShift, Adroll, MNTN, Microsoft Clarity, The Trade Desk, Centro/SiteScout Basis, Tapad, Extole, and New Relic;

   g. Defendant's computing servers;

h. Third-party source code utilized by Defendant; and

i. Computer servers of Third Parties (including Facebook) to which Plaintiff's and Class Members' communications were disclosed.

335. Defendant is a "person" under the Florida Wiretap Act. Ind.Code 35–33.5–1–5.

336. Defendant aided in the interception of communications between Plaintiff and Class Members and Defendant that were redirected to and recorded by third parties without Plaintiff's or Class Members' consent.

337. Under the Florida Wiretap Act, Plaintiff and the Class Members are entitled to injunctive relief prohibiting further eavesdropping by Defendant, actual damages, and punitive damages.

338. Defendant's violation of the Florida Wiretap Act caused Plaintiff and Class Members the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of their relationship with trusted financial providers;

c. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members'

knowledge or informed consent and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the financial services for which they paid, which included Defendant's duty to maintain confidentiality; and

e. Defendant's actions diminished the value of Plaintiff's and Class Members' Personal and Financial Information;

f. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

## COUNT XIII
## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT ("CFAA") 18 U.S.C. § 1030, *et seq.*
## (On Behalf of Plaintiff and the Classes)

339. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

340. Plaintiff's and the Class Members' computers and mobile devices are, and at all relevant times have been, used for interstate communication and commerce, and are therefore "protected computers" under 18 U.S.C. § 1030(e)(2)(B).

341. Defendant exceeded, and continues to exceed, authorized access to Plaintiff's and the Class Members' protected computers and obtained information thereby, in violation of 18 U.S.C. § 1030(a)(2), (a)(2)(C).

342.    Defendant's conduct caused "loss to 1 or more persons during any 1-year period… aggregating at least $5,000 in value" under 18 U.S.C. § 1030(c)(4)(A)(i)(I), *inter alia*, because of the secret transmission of Plaintiff's and the Class Members' Personal and Financial Information as set forth in detail herein, which were never intended for public consumption.

343.    Defendant's conduct also constitutes "a threat to public health or safety" under 18 U.S.C. § 1030(c)(4)(A)(i)(IV), due to the private and personally identifiable data and content of Plaintiff and the Class Members' Personal and Financial Information and communication being made available to Defendant and Third Parties without adequate legal privacy protections.

344.    Accordingly, Plaintiff and the Class Members are entitled to "maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually, on behalf of herself and all others similarly situated, prays for judgment as follows:

A.    For an Order certifying this action as a Class action and appointing Plaintiff as Class Representatives and Plaintiff's counsel as Class Counsel;

B.     For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

C.     For an award of punitive damages, as allowable by law;

D.     For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Personal and Financial Information and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

E.     For an Order declaring the rights and obligations of the parties, including, without limitation, that Defendant owes a legal duty to its Customers to secure their Personal and Financial Information and that Defendant violates this legal duty by disclosing its Customers' Personal and Financial Information to unaffiliated Third Parties;

F.     For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of Personal and Financial Information compromised and unlawfully disclosed to Third Parties;

G.      For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

H.      For an Order compelling Defendant to pay for not less than three years of credit monitoring services for Plaintiff and the Classes;

I.      For an award of reasonable attorneys' fees and costs under the laws outlined above, the common fund doctrine, and any other applicable law;

J.      Costs and any other expenses, including expert witness fees incurred by Plaintiff in connection with this action;

K.      Pre- and post-judgment interest on any amounts awarded; and

L.      Such other and further relief as this court may deem just and proper.

## JURY DEMAND

Plaintiff, on behalf of herself, and all others similarly situated, hereby demands a trial by jury on all issues so triable.

Dated:      May 14, 2025                    Respectfully submitted,

                                            */s/ Jake Phillips*
                                            Jacob Phillips
                                            Florida Bar No. 0120130
                                            JACOBSON PHILLIPS PLLC
                                            2277 Lee Road, Suite B
                                            Winter Park, FL 32789

Phone: (321) 447-6461
Fax: (407) 612-2206
jacob@jacobsonphillips.com

Lynn A. Toops*
Amina A. Thomas*
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com
athomas@cohenandmalad.com

J. Gerard Stranch, IV*
Emily E. Schiller*
STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com
eschiller@stranchlaw.com

Samuel J. Strauss*
Raina C. Borrelli*
STRAUSS BORRELLI, PLLC
980 N. Michigan Avenue, Suite 1610
Chicago, Florida 60611
(872) 263-1100
(872) 263-1109 (facsimile)
sam@straussborrelli.com
raina@straussborrelli.com

* to seek admission *pro hac vice*

***Counsel for Plaintiff and the
Proposed Classes***